Nathan (Nat) MINCHEN et al., Appellants,

v.

R. L. FIELDS et al., Appellees.

No. 13093.

Court of Civil Appeals of Texas.

Houston.

Dec. 10, 1959.

Rehearing Denied Jan. 7, 1960.

Cooper K. Ragan, John L. Russell, Houston, for appellants Jay Bertrand and Jane Sue Hogan.

Hirsch & Westheimer, W. A. Robertson, Houston, for appellant Nathan Minchen.

Wm. A. Cline, Wharton, Perkins & Vollentine and Denver E. Perkins, Gonzales, for appellees R. L. Fields and B. E. Fields.

W. J. Knight, Houston, attorney for appellee Flora Barnes.

BELL, Chief Justice.

This appeal involves primarily the question of whether the act of the holder of the executive rights on the mineral interests in several separate but contiguous tracts of land in executing the usually employed oil and gas lease, without an express pooling provision, covering all of such tracts, thereby unitizes or pools the minerals so that all mineral owners will share in the royalty from production from any of the tracts covered by the lease.

The Trial Court, on trial without a jury, held the minerals were not pooled so as to entitle all mineral owners to share in the royalties from whatever tract produced, but that royalty and mineral owners were confined to royalties from production on the specific tract under which they owned minerals or royalty. Too, the Court held the appellants had not ratified the lease so as to effect a pooling. Further, it held the appellants were not entitled to any portion of the oil payment of $60,195 reserved by the lessor out of 1/32 of 7/8 of the minerals as an additional consideration for the execution of the lease.

The land covered by the lease was 802.6 acres in Wharton County, being a part of Missouri Lincoln Trust Company Subdivision in the D. D. D. Baker Survey. Production of oil was only from Block 26 of said Subdivision. Appellants owned no interest in this block apart from such as they might have gotten through pooling.

On February 28, 1947, R. L. Fields and wife were the owners of certain undivided

mineral interests in the various tracts making up the 802.6 acres, and were the exclusive owners or holders of the executive rights on all of the tracts. At such time there were certain mineral and royalty interests outstanding in persons other than the Fields. The particular persons who owned such interests and the particular amount of such interest is unimportant except as to that owned by appellants.

On February 28, 1947, R. L. Fields and wife, as lessors, leased the entire 802.6 acres to Progress Petroleum, Inc. The lease made no mention of any as lessors except Fields and his wife. The lease was the usual one employed in the oil and gas industry. It reserved to lessors a ⅛ royalty on oil, on gas a ⅛ or if gas was sold at the well ⅛ of the amount realized from the sale, and on sulphur 50¢ per long ton. It provided for the payment of delay rentals in lieu of drilling to keep the lease in force in the absence of production of minerals in paying quantities, but it would continue in force so long as oil, gas or other minerals were produced in paying quantities. The delay rentals were to be $4,013. This amounts to $5 per acre. A cash bonus of $4,013 was paid on execution of the lease. The lease provided that as a further consideration for the execution of the lease, lessor was "to receive $60,195 out of ⅟₃₂ of ⅞ of the oil, gas or other minerals, if, as and when produced, saved and sold." It was further provided that production of minerals in paying quantities from any portion of the 802.6 acres would keep the lease in force as to all of the acreage covered by the lease. Then the lease contained the usual proportionate reduction clause should lessor own less than fee simple title to all the land leased. The lease had no express pooling or unitization provision. The description of the 802.6 acres contained in the lease was split into three tracts. The first tract described 740 acres, which included the acreage under which appellants owned royalty or mineral interests. Tract 2 was Block 26 of the above mentioned Subdivision and contained 39.30 acres. It

is this tract from which there has been production. Tract 3 was Block 26–A of said Subdivision, containing 23.30 acres.

At the time the lease was executed by Fields and his wife, the following mineral or royalty interests were outstanding in persons other than the Fields:

1. The "Ball" ⅟₁₆ perpetual non-participating royalty, covering a specifically described 595.6 acres out of the 802.6 acres. This originated in a conveyance from the Wharton Development Co. to M. D. Ball. At the time the lease was executed and at the time of trial this interest was owned by Ethel A. Giblin. There was no production from this acreage and from a judgment holding there was no pooling of this acreage the owner has not appealed.

2. The "Phillips" ¼ non-participating royalty interest. This originated in a conveyance dated April 3, 1935, from J. R. Tinsley and wife, the then owners, to B. Wendell Phillips of that portion of Blocks 3, 4, 5 and 6 of the above named Subdivision lying west of the Third Lift Canal. This covered a tract of 284.74 acres. The conveyance was for a term of 20 years and for so long as oil, gas or other minerals were produced therefrom in paying quantities. This interest at the time of the lease was owned by appellant, Nat Minchen, and J. Newton Rayzor. Rayzor did not appeal from the judgment holding there was no pooling of the minerals and the term having expired the mineral interest had reverted to the Fields. There was no production from this 284.74 acres. This conveyance provided that no lease should be made that did not reserve at least the usual ⅛ royalty.

3. The "Bertrand" ⅛ term mineral interest covering a specifically described 97.32 acre tract. This interest originated in a conveyance from J. R. Tinsley and wife to Jay Bertrand dated January 24, 1936. It was for a term of 20 years and for so long as oil, gas and other minerals were produced in paying quantities. When the lease was executed this interest was owned

by appellants Bertrand and Hogan. The Trial Court held this interest in said appellants had terminated as there was no production from the acreage and the minerals had not been pooled.

4. The "Houston" 1/32 perpetual non-participating royalty interest in a tract of 60.1 acres and the west 40 acres of Block 26. This originated in a conveyance from J. R. Tinsley and wife to Susan L. Houston, dated February 10, 1936. The deed provided that any lease to be executed should reserve a sufficient royalty to take care of her 1/32 royalty interest, that is, 1/4 of the usual 1/8 royalty. This interest was owned by Susan L. Houston at the time the lease was executed. However, as a result of subsequent conveyances, this interest became vested in various other persons.

5. The "Tinsley" royalty interest in and under the entire 802.6 acres. The royalty interest reserved by J. R. Tinsley and wife when they conveyed the 802.6 acres to R. L. Fields and wife varied in amount as to the separate tracts making up the total acreage. The fact of importance is not the amount of royalty, but that there was outstanding, at the time the lease was executed, royalty in persons other than the Fields and appellants.

In December, 1950, the Tinsleys, then owners of the Tinsley royalty, and the owners of the working interest under the lease, ratified the lease, but provided it should not be construed as unitizing or pooling of the royalty interest with any other tract covered by the lease.

The oil payment of $60,195, provided for in the lease to Progress Petroleum, Inc., was owned at the time of trial in equal shares by Flora Barnes, B. E. Fields and R. L. Fields and his wife, unless appellants are entitled to share in this oil payment. The Trial Court held they were not entitled to share in it.

The above interests, excluding the oil payment created by the lease were all outstanding when the lease was executed.

After the lease was executed, the following interests were conveyed:

1. On March 3, 1947, Progress Petroleum Company conveyed to A. N. Wilson an overriding royalty of 1/32 of 7/8 of the oil, gas and other minerals that were produced and saved from land covered by the lease.

2. On April 9, 1947, Progress Petroleum assigned to Choate and Davis an oil payment of $80,260 payable out of 1/16 of 7/8 of the oil, gas or other minerals produced from the land covered by the lease.

The Trial Court held that the lease did not effect a pooling or unitization of the various separate tracts covered by it; that there had been no ratification of the lease so as to effect any pooling; that there having been no pooling, and, there having been no production from appellants' acreage and appellants' interests being for a term that had expired, appellants' interests had reverted to the Fields, that is, R. L. Fields and wife and B. E. Fields; and, that appellants were not entitled to any portion of the oil payment provided for in the lease as an additional consideration for its execution.

The appellant Minchen, while admitting that Fields and his wife had no authority to pool his interest, contends that they purported to do so by the lease to Progress Petroleum, Inc. and that Minchen ratified the lease. He contends he is, therefore, entitled to share in the royalty on production from Block 26; that he is entitled to his proportionate share of the oil payment reserved as a consideration for the execution of the lease; and, that his term royalty interest has not terminated because of the unitization.

Appellants Bertrand and Hogan seem to contend that the owner of the executive rights had the right to pool their interests; that Fields and his wife, the holders of such rights, did so by the execution of the lease to Progress Petroleum Company; that they are entitled to their proportionate share of

the royalties on production from Block 26; that their mineral interest continues in force so long as there is production under the lease anywhere on the 802.6 acres; and, that they are entitled to their proportionate share of the oil payment reserved as a part of the consideration for the execution of the lease.

Appellants rely on the cases of Parker v. Parker, Tex.Civ.App., 144 S.W.2d 303, error ref., and French v. George, Tex.Civ. App., 159 S.W.2d 566, error ref., which hold that where owners of separate but contiguous tracts of land join in the execution of a lease, they thereby effect a pooling of their mineral or royalty interests. Then they rely on Southland Royalty Company v. Humble Oil & Refining Company, 151 Tex. 324, 249 S.W.2d 914, which held that where a term mineral or royalty owner, whose term is for a designated number of years and so long as minerals are produced in paying quantities, pools his interest and there is production from a part of the unitized tract other than that contributed by the term owner, his interest is nevertheless kept alive so long as minerals are produced in paying quantities from any part of the unitized acreage.

While appellant Minchen, as above mentioned, seems to admit the Fields had no authority to unitize the separate tracts and relies primarily on ratification, Hogan and Bertrand contend that the Fields had the authority to unitize, and, by the execution of one lease covering all tracts in which they purported to be the only lessors, in which they provided that production from any portion of the 802.6 acres would keep the lease in effect as to all the acreage and in which they failed to mention the payment of royalty to the owners of the separate tracts for production from such separate tract, the Fields effectively unitized the mineral and royalty acreage.

■ The owner of the exclusive executive rights is an agent for the royalty and mineral owners to execute a mineral lease on the acreage under which the particular owner owns a royalty or mineral interest. Merely by virtue of his having executive rights, he does not have authority to pool or unitize the mineral or royalty rights under a particular tract owned by specified persons with minerals or royalties under another tract owned by other persons. Brown v. Smith, 141 Tex. 425, 174 S.W.2d 43; Nugent v. Freeman, Tex.Civ.App., 306 S.W.2d 167, error ref., n. r. e. The reason of the rule is that where mere executive rights are conferred or reserved, there is no intention evidenced to vest authority to convey a royalty interest reserved or the royalty interest attributable to the minerals leased and to hold that such holder can unitize or pool the interest would allow him to convey such royalty interest because a unitization of the royalty and minerals under different tracts effects a cross-conveyance to the owners of minerals under the various tracts of royalty or minerals so that they all own undivided interests under the unitized tract in the proportion their contribution bears to the unitized tract. Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472; Brown v. Smith, supra.

■ The joint ownership of royalty is created by the action of the several landowners who own the minerals and royalty in joining in the lease. French v. George, supra. The act of the owners in joining in a lease covering their lands evidences, as a matter of law, the intent to unitize the royalties and minerals covered by the lease.

■ We hold that R. L. Fields and wife, by leasing the several tracts of land as one tract, there being no pooling or unitization provision in the lease, did not thereby unitize or pool the minerals under the various tracts so that the owners of royalty or minerals under one or more of the tracts would be entitled to share in the royalty on production from a tract covered by the lease in which they had no royalty or mineral interest prior to the lease. Nugent v. Freeman, supra; Martel v. A. Veeder Co., 199 La. 423, 6 So.2d 335. There was no provision in the lease indicating that the Fields

intended that the owners of royalty or minerals under specific tracts would share in the royalty from production on other tracts covered by the lease. Not only this, but the Fields had no authority to unitize the acreage in this regard. There were outstanding royalty interests in other persons as to parts of the 802.6 acres, as previously pointed out, and their interests could not be thus affected by the Fields, nor could that of appellants.

We will now notice Minchen's contention that though the act of the Fields in leasing the land may not have effected a unitization of the minerals and royalties for want of authority to do so, he ratified the lease and thus as to him a unitization of his royalty interest was effected. The Trial Court found that he had not ratified the lease and in fact had refused to do so.

Minchen asserts that by demanding and receiving his portion of the cash bonus and delay rentals he ratified ·the lease. The evidence shows that Minchen in May, 1947, after learning of the lease, wrote one Davis, who he thought was the agent of Fields, and demanded his part of the cash bonus covering the entire interest under 284.74 acres in Blocks 3, 4, 5 and 6, stating he was the owner of 67.98 acres of minerals in this (284.74) tract. In June, 1947, he wrote Davis another letter asking for such bonus. Then he accepted Fields' check for his part of the cash bonus for his interest in 284.74 acres. Minchen also accepted delay rentals attributable to his acreage. In August, 1947, he was sent an instrument whereby he would expressly ratify the lease. He executed it, but before delivery struck his signature and acknowledgment therefrom. He says he did this because it would permit his land to be at any time surrendered by the lessee. The lease itself, it is to be noted, would permit the same thing. Minchen was served with citation in this suit in June, 1952. In his answer he asserted the lease was unitized by the Fields. It was not until the day the case came up for trial, on June 11, 1956, that Minchen asserted he had rati-

fied the lease. Production commenced on Lot 26 in December, 1948. No demand for any of the royalties was made by him until after this suit for a declaratory judgment was filed by the Fields. His term expired in April, 1955.

We hold, as did the Trial Court, that there was no ratification of the lease by Minchen so as to effect a unitization of the minerals and royalties. It is unnecessary for us to pass on the question as to whether it was ratified to the extent that the production from Tract 26 would keep the lease in force as to the Minchen tract. That question is not involved in this proceeding.

The lease as executed by the Fields did not purport to effect unitization. The act of leasing was but an exercise of the executive rights in Fields as to each separate tract of land insofar as royalty payment is concerned. The act of Minchen in accepting the cash bonus and delay rentals measured by the mineral acreage he owned under the 284.74 acres was but a confirmation that the Fields had the right to lease the 284.74 acres. Had the land been leased alone, he would have been entitled to the same cash bonus and delay rentals. His acceptance of these payments could in nowise be referable to any attempted act of the pooling of royalty or mineral interests for the simple reason there was nothing in the lease that purported to effect unitization or pooling of royalties.

Apart from this, however, Minchen was not in a position to by his unilateral action effect a unitization of royalties. Where it has been held there has been unitization, a situation was presented where all of the royalty owners have consented to the cross-assignment of interests by joining in the lease or after its execution have effectively made themselves parties to it. In each instance all of the owners had acted so as to become parties to the lease itself. Here when the lease was executed there were outstanding interests in various persons owning the Ball, Houston and Tinsley interests, and at the time Minchen claims

ratification they were outstanding. If it is held that Minchen by his unilateral act could ratify the lease so as to effect a unitization of royalties, the royalty interests of the nonjoining owners would be reduced. This cannot be done without their agreement. Gulf Oil Corporation v. Marathon Oil Co., 137 Tex. 59, 152 S.W.2d 711.

The Trial Court's finding that Minchen had not ratified the lease so as to effect a pooling of the royalties finds support in the evidence.

Neither was there ratification by Bertrand and Hogan. They could not, as above demonstrated, ratify so as to effect a unitization of the royalties without being joined by all of the owners of interests in the various tracts.

Factually it appears that Fields had failed to remit, as he had agreed to do, Bertrand's part of the cash bonus and delay rentals. In 1956 he drew from the depository bank the delay rentals that had been paid by Sohio. He, in this suit, recovered his portion of the first delay rentals and the cash bonus. Bertrand was served with citation in the case in December, 1955. He for the first time claimed ratification in an amended answer filed June 6, 1956. Bertrand learned at least in 1953 there was production from Lot 26. He never demanded any portion of the royalties. When in June, 1956 Bertrand for the first time claimed ratification, his interest under the 97.32 acre tract had expired.

Mrs. Hogan is legally in the same position as Bertrand. Suit was filed against her in 1952. For the first time in her amended answer of June, 1956, she seeks to assert ratification. There had been deposited to her former husband one delay rental. Whether it was ever drawn down does not appear in the evidence. In any event, what we have said as to Minchen applies here so that we hold there was no ratification by Bertrand and Hogan so as to effect unitization of the royalties.

Minchen contends that he is entitled to his proportionate part of the oil payment that was reserved in the lease as an additional consideration for its execution.

At this point we might say there is no question in our minds that the oil payment provided for in the lease is a bonus and not royalty because it is provided that lessors shall be paid $60,195 out of $\frac{1}{32}$nd of $\frac{7}{8}$ths of the oil and/or gas and other minerals. This provision bears the mark that distinguishes between royalty and bonus, that is, a bonus is not payable throughout the life of the lease while royalty is. State National Bank of Corpus Christi v. Morgan, 135 Tex. 509, 143 S.W.2d 757; Griffith v. Taylor, 156 Tex. 1, 291 S.W.2d 673.

We hold that Minchen is not entitled to any part of the bonus.

There was no production from the tract under which Minchen owned an interest. He would be entitled to his proportionate part of the total bonus provided for in the lease to the extent that production was from his acreage. As above stated with regard to royalties, so here, with regard to bonus, there is nothing in the lease showing an intent to pool the interest from the various tracts to make up the oil payment. A mathematical calculation will show that the oil payment represented a bonus of $75 per acre. Really, the lessors are all of the owners of royalty and mineral interests, whether named in the lease or not, acting through their agents so far as the agent has authority to act, and there is in effect a separate lease on each tract. The result is that had there been production on Minchen's land he would have been entitled to a bonus of $75 per acre for his interest.

This construction, we feel, as did the Trial Court, gives effect to the intention of the parties to the lease and gives to Minchen all he has a right to demand. Too, it exacts of the Fields, Minchen's agent, utmost good faith in exercising their power to lease. They could not contract for a disproportionate bonus in favor of themselves at the expense of their principals.

They have not done so because under our construction each owner would be entitled to $75 per acre bonus out of oil or other minerals produced from his tract, which is all they have a right to demand.

This same reasoning applies to Bertrand and Hogan so as to deny them any part of the bonus.

Additionally, it is noted that the record reflects that Minchen knew of production for some six or seven years before suit was brought and never made demand for any payment. He thus placed a construction on the lease with regard to bonus that he was entitled to none from oil as production was not on his land.

The same thing is true of Bertrand, who knew of production some two or three years before he was sued.

The judgment of the Trial Court is affirmed.